**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ALEXANDER MILLIGAN SHARP, IV,

Plaintiff,

vs. CASE NO. 3:06-cv-200-J-TEM

CITY OF PALATKA,

Defendant.

---

**O R D E R**

This cause is before the Court on Defendant's Motion for Summary Judgment (Doc. #24), Plaintiff's Responses in opposition thereto (Docs. #49, #50[1]), Defendant's Motion to Strike Portions of Affidavits Filed in Opposition to Defendant's Motion for Summary Judgment and Motion to Strike Portions of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. #40), and Plaintiff's response in opposition thereto (Doc. #43).

This action involves the alleged deprivation of Plaintiff's Civil Rights under 42 U.S.C. § 1983. (*See* Doc. #1, Complaint).[2] Plaintiff claims he was retaliated against by his employer, the City of Palatka Police Department, for exercising his rights to freedom of

---

[1] Plaintiff originally filed his Response to Defendant's Motion for Summary Judgment as Doc. #35. Plaintiff thereafter filed a revised response under Doc. #38 and now, pursuant to the Court's request, Plaintiff re-filed his revised response as Doc. #49, with Doc. #50 comprising exhibits.

[2] Plaintiff initially filed a two count complaint (Doc. #1). Count II of Plaintiff's original complaint was eventually dismissed by court order on May 16, 2006. (Doc. #7). Subsequently, Plaintiff filed an amended complaint (Doc. #53), in which, Plaintiff incorporated Count I of his original complaint and added a second count. Defendant then filed a motion for partial summary judgment as to Count II of Plaintiff's amended complaint (Doc. #67). The Court notes that it will rule upon said motion by separate order. The instant motion for summary judgment, however, was filed prior to the filing of Plaintiff's amended complaint; therefore, the Court will hereinafter refer to Count I as it relates to Plaintiff's amended complaint (Doc. #53).

speech and association under the First Amendment. (Doc. #53, Amended Complaint). Plaintiff seeks a trial by jury and more than one million dollars in damages. (*See* Doc. #53; Doc. #75).

## I. Factual Background[3]

Plaintiff Alexander Sharp was employed with the Palatka Police Department (PPD) from 1991 until March 13, 2004, when he resigned under what he describes as "extreme duress." (Sharp Aff. [Doc. #36-2] at ¶ 31). At the time Plaintiff resigned, his immediate supervisor at the PPD was Lt. Rodney Harper (Harper Aff. [Doc. #36-3] at ¶ 2) and the Chief of Police was Gary Getchell (Getchell Aff. [Doc. #26-4] at ¶ 1). Although Plaintiff claims he and Chief Getchell had a contentious relationship going back to mid-2001 (when Getchell was hired as Chief of Police) the events leading up to the instant action occurred primarily between December 2003 and March 2004. (*See generally* Sharp Dep. [Doc. #80-6] at 25); Sharp Aff. at ¶¶ 24-30; Cheatham Aff. [Doc. #26-3]; Getchell Aff. at ¶¶ 18-33).

On December 19, 2003, Chief Getchell announced a promotion opportunity at the PPD for the position of lieutenant–a position which required qualified applicants to have, among other things, a college degree. ( Doc. #50, Exh. 16). Plaintiff asserts he believed the degree he was due to receive that same month met this particular qualification, and that he was the only current member of the PPD who fulfilled the minimum qualifications at that time. (Sharp Aff. at ¶ 25).

[3] The Court notes that the facts included in the background section were taken from the numerous affidavits and deposition transcripts filed in this case. The Court has found that some of the statements contained within the affidavits and depositions are, in fact, inadmissible hearsay; therefore, unless otherwise discussed in the analysis, those statements that are hearsay are immaterial to the Court's decision and are included only for background purposes.

Further, in mid-December 2003, Plaintiff alleges he told some fellow officers that he was thinking about running for Sheriff. (Sharp Dep. at 50-51). At least three other officers were present during the conversation; however, Chief Getchell was not among them. (Sharp Dep. at 51). Plaintiff claims his intention to run for Sheriff was "common knowledge throughout the department." (Sharp Dep. at 110-111).

On January 7, 2004, Plaintiff officially qualified to run for Sheriff of Putnam County. (Sharp Aff. ¶ 1). As to his campaign, Plaintiff states that he believed consolidation of the PPD and the Putnam County Sheriff's Office would provide "one centralized law enforcement agency for the entire county." (Sharp Aff. at ¶ 1). Plaintiff maintains that he considered this idea to be "an integral part" of his candidacy and that he was "vocal to fellow employees, citizens and the general public" about this idea to consolidate the PPD and the Putnam County Sheriff's Office. (Sharp Aff. at ¶ 1).

Arron Thomas, one of Plaintiff's subordinates, stated that "Sharp expressed to me on several occasions his platform for Sheriff and how he would implement consolidation of the PPD into the Sheriff's Office. These conversations occurred primarily at my residence and off duty." (Thomas Aff. [Doc. #36-6] at ¶ 3).

On January 8, 2004, Plaintiff submitted his application for the open lieutenant position to Chief Getchell. (Getchell Aff. at ¶ 20). Chief Getchell claims he was "bewildered" by Plaintiff's application because, although Plaintiff submitted documents that indicated he had received his college degree in December 2003, Chief Getchell had reason to believe Plaintiff received his college degree prior to that date.[4] (Getchell Aff. at ¶ 20).

---

[4] Chief Getchell stated that he recalled he heard Plaintiff state he had a college degree prior to

(continued...)

On or about January 9, 2004, Chief Getchell was contacted by a reporter for the Palatka Daily News seeking his comments for a story, which was scheduled to print on January 10, 2004 and which would announce Plaintiff's candidacy for Sheriff. (Getchell Aff. at ¶ 22). Chief Getchell maintains it was during this conversation that he learned of Plaintiff's intention to run for Sheriff. (Getchell Aff. at ¶ 22).[5]

That same day, on January 9, 2004, Chief Getchell issued a memo to all PPD employees "reminding them of the city's policy on political campaigning while on duty." (Getchell Aff. at ¶ 22 and Exh. L). Also, on January 9, 2004, Chief Getchell changed the minimum requirements for the open lieutenant's position. (Getchell Aff. at ¶ 21). Chief Getchell claims the reason for this change was that he determined no current members of the PPD fulfilled the minimum requirements for the lieutenant's position and that by changing the requirements more officers could apply for the position, including Plaintiff. (Getchell Aff. at ¶ 21). Chief Getchell maintains that after he changed the requirements, he determined that Plaintiff and one other officer, Sgt. Reno Fells, both qualified for the position. (Getchell Aff. at ¶ 21, *see also* Doc. #50, Exh. 18).

Apparently, between December 2003 and January 2004, some confusion arose as to whether Plaintiff would be required to take a leave of absence from his position at the PPD while running for political office. Plaintiff maintains that Chief Getchell relayed to him through the chain of command that he would be forced to take a leave of absence if he ran

---

[4](...continued)
December 2003. Chief Getchell subsequently confirmed Plaintiff put on a previous application to the FBI that he had a bachelor's degree as of 2000. (Getchell Aff. at ¶ 20).

[5] Plaintiff produced the January 10, 2004 Palatka Daily News article announcing his candidacy for Sheriff when he re-filed his response to Defendant's motion for summary judgment. (*See* Doc. #50, Exh. 20).

for political office. (Sharp Dep. at 112-13). Lt. Harper states in his deposition testimony that Chief Getchell told him to tell Plaintiff that Plaintiff would have to resign if he sought political office. (First Harper Dep. [Doc. #72-13] at 44-46). Lt. Harper, however, later states, in his affidavit, that Chief Getchell told him to tell Plaintiff he would probably have to take a leave of absence if he decided to run for Sheriff. (Harper Aff. at ¶¶ 7 and 8).

Sgt. Fells states in his affidavit that he told Plaintiff there was a question as to whether he might be required to take a leave of absence, but that he never told Plaintiff he would be required to do so. (Fells Aff. [Doc. #26-9] at ¶ 4). Chief Getchell maintains that it was Lt. Harper who mentioned to him that Plaintiff would be required to take a leave of absence if he ran for Sheriff. (Getchell Aff. at ¶ 22). Chief Getchell states that it was because of Lt. Harper's statement that he decided to investigate the department's policy on political campaigns, during which he learned that Plaintiff would not be required to take a leave of absence. (Getchell Aff. at ¶ 22).

Despite conflicting statements, however, Plaintiff was ultimately never required to take a leave of absence. (Sharp Dep. at 58).

On January 22, 2004, Plaintiff, Chief Getchell and Lt. Harper met and discussed Plaintiff's concern about "tensions" that arose regarding Plaintiff's decision to run for Sheriff. (Getchell Aff. at ¶ 23 and Exh. N). On February 13, 2004, Chief Getchell issued a memo documenting the contents of that meeting. (Getchell Aff., Exh. N). On February 16, 2004, Chief Getchell issued another memo to Plaintiff regarding media telephone calls reportedly received by the PPD seeking to contact Plaintiff regarding his campaign. (Getchell Aff., Exh. M). This memo informed Plaintiff that permitting the media's requests, while on duty,

would be in violation of city policy and, as such, the PPD declines to "act as your [Plaintiff's] campaign message service." (Getchell Aff., Exh. M).

On February 23, 2004, a citizen interview board conducted interviews of both Plaintiff and Sgt. Fells for the open lieutenant position. (Getchell Aff. at ¶ 24). Following discussion, the three-person interview board unanimously recommended Sgt. Fells be granted the promotion over Plaintiff. (Getchell Aff. at ¶ 24; Sharp Dep. at 114-15*;* Asia Aff. [Doc. #26-10]; Deputy Aff. [Doc. #26-11]).[6]

Shortly thereafter, on March 3, 2004, Plaintiff was informed that an internal affairs investigation (hereafter "IA 1106") had been initiated regarding his conduct and possible violations of PPD policies. (Second Griffith Aff. [Doc. #26-13] at ¶ 10 and Exh. C). IA 1106 pertained to the possibility that in October 2003 Plaintiff had revealed information to individuals outside the police department about an ongoing criminal investigation, in violation of city policy. (Second Griffith Aff. at ¶ 10 and Exh. C*; see also* Sharp Aff. at ¶ 26). During the course of his investigation, Assistant Chief Griffith uncovered information that Plaintiff may have falsified information on a police report. (Second Griffith Aff. at ¶ 13). Also during the course of inquiry into IA 1106, Assistant Chief Griffith discovered information that led to the commencement of two additional internal affairs investigations (IA 1107 & IA 1108). IA 1107 was initiated to determine whether Plaintiff had falsified documents by including inaccurate information about the status and date of his college degree. (Getchell Aff. at ¶ 20 and Exh's. K & P). IA 1108 was opened and centered around whether several months earlier Plaintiff had given false testimony in a deposition

[6] Cynthia Asia and Sam Deputy were two individuals on the three-person interview board that interviewed both Plaintiff and Sgt. Fells for the open lieutenant's position.

in a civil matter. (Second Griffith Aff. at ¶ 14 and Exh. I). These three internal affairs investigations formed the basis of a charging affidavit ultimately filed with the State Attorney's Office concerning Plaintiff's possible criminal violations. (*See generally* Willis Aff. [Doc. #66-2]; Third Griffith Aff. [Doc. #66-4]).

The following day, on March 4, 2004, Plaintiff delivered a written grievance to Chief Getchell complaining that Getchell was retaliating against him for his "political ambitions" by opening the aforementioned internal affairs investigations. (Sharp Aff. at ¶ 27). Chief Getchell acknowledged the grievance in writing on March 6, 2004, and forwarded it to City Manager Allen Bush on March 8, 2004. (Getchell Aff. at ¶ 6; Bush Aff. [Doc. #26-2 at ¶ 10).

Shortly thereafter, Assistant Chief James Griffith reported that some of Plaintiff's subordinates allegedly appeared "nervous" while speaking to internal affairs investigators. (Getchell Aff. at ¶ 27; Second Griffith Aff. at ¶ 10). Since Plaintiff was in a position of authority, Chief Getchell and Assistant Chief Griffith jointly decided to reassign Plaintiff until the pending investigations were completed. (Getchell Aff. at ¶ 27; Second Griffith Aff. at ¶10).

On March 12, 2004, a memo was delivered to Plaintiff by Sgt. Fells and Lt. Harper informing him that he had been reassigned to the records department of the PPD. (*See* Doc. #50, Exh. 13; Sharp Aff. ¶ 30). Plaintiff was ordered to relinquish his PPD identification badge, his service weapon, his police badge and patrol vehicle. (*See* Doc. #50, Exh. 13). Plaintiff claims that neither Sgt. Fells, nor Lt. Harper provided him with an explanation for his reassignment. (Sharp Aff. at ¶ 30).

Plaintiff alleges that he went to see City Manager Bush concerning his reassignment to the records department. (Sharp Aff. at ¶ 30). Plaintiff claims he informed Bush that his

reassignment was retaliatory for his political speech, was discipline without cause, and was a violation of Plaintiff's Police Bill of Rights. (Sharp Aff. at ¶ 30). City Manager Bush never mentions this alleged meeting in his affidavit. (*See* Bush Aff.).

The following day, on March 13, 2004, Plaintiff tendered his resignation to the PPD. (Sharp Aff. at ¶ 31).

**II. Standard of Review**

Summary judgment is appropriate only when a court is satisfied "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The burden of establishing the absence of a genuine issue is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Federal Rule of Civil Procedure 56(e) states in relevant part:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must----by affidavits or as otherwise provided in this rule---set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2) (2007).

The party moving for summary judgment bears the initial burden of demonstrating to the court "by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). A court "must draw all reasonable inferences in favor of the nonmoving party,

and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 149-150 (2000) (discussing standard for granting judgment as a matter of law under Fed. R. Civ. P. 50, which mirrors the standard for granting summary judgment under Rule 56); *Hinson v. Clinch County Bd. of Educ*., 231 F.3d 821, 826-27 (11th Cir. 2000). The Court considers the entire record, but must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves*, 530 U.S. at 151; *Hinson*, 231 F.3d at 827.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there is a material issue of fact that precludes summary judgment. *Clark*, 929 F.2d at 608. The non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts, through affidavits or other forms of evidence provided for by the rules. *Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970).

"[T]he inquiry is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252-52. A genuine issue of material fact exists where there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*). As the Supreme Court has stated, if the record as a whole could not lead a rational fact-finder to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Electric Industry Co. v. Zenith Ration Corp*., 475 U.S. 574, 587 (1986).

Furthermore, in deciding a motion for summary judgment, all the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**A. Defendant's Motion to Strike**

As a preliminary matter, Defendant has filed a motion to strike portions of affidavits and portions of the memorandum used in support of Plaintiff's opposition to the instant motion. (Doc. #40). In said motion to strike, Defendant moves to strike sixty nine separate statements from various affidavits filed by Plaintiff along with those portions of Plaintiff's memorandum of law in opposition to Defendant's motion for summary judgement that refer to the statements objected to. (*See* Doc. #40).

Of the objected to statements, the Court finds that some are inadmissible hearsay and others are arguably so. Therefore, Defendant's motion to strike (Doc. #40) is **GRANTED to the extent that** those statements which the Court deems inadmissable hearsay will not be considered by the Court in deciding the instant motion.

Defendant, however, makes one argument in its motion to strike that the Court finds necessary to address separately. Defendant argues that Plaintiff directly contradicts statements made in his affidavit by earlier deposition testimony. (Doc. #40 at 5). Defendant points out that an affidavit may not be used to contradict earlier testimony for the purpose of raising a material factual issue for trial. (*See Principi v. Survivair, Inc.*, 231 F.R.D. 685, 689 (M.D. Fla. 2005). Defendant claims that in response to direct questioning concerning what speech Plaintiff engaged in that initiated the alleged retaliatory acts,

Plaintiff responded that it was only the announcement of his intention to run for Sheriff (Doc. #40 at 5-6; *see also* Sharp Dep. at 61).

While the Court recognizes Plaintiff's response in answering the aforementioned deposition question is not entirely clear or articulate as to what particular speech Plaintiff claims he engaged in as the basis of his claims, Plaintiff went on to state that he believed there were additional factors that occurred after he announced his intention to run for Sheriff that compounded the alleged retaliatory acts. (*See* Sharp Dep. at 61).

When considering a motion to strike, "[t]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine at which point in time and with which words the... affiant... was stating the truth. *Pashoian v. GTE Directories*, 208 F. Supp. 2d 1293, 1299 (M.D. Fla. 2002) (*quoting Tippens v. Celotex Corp.*, 805 F.2d 949, 953-954 (11th Cir. 1986).

Here, the Court finds that, although Plaintiff's statements appear ambiguous, to disregard his statements as a sham is not warranted at this stage of the proceedings. Plaintiff's statement that he believed there were additional factors that compounded the alleged retaliatory acts leaves open the possibility that Plaintiff may have been contemplating his political platform when responding to the aforementioned deposition question.

**B. 42 U.S.C. § 1983 Deprivation of Rights, Privileges or Immunities Secured by the Constitution.**

Plaintiff is seeking relief under 42 U.S.C. § 1983, thus, Plaintiff carries the burden of proving, among other things, that he has suffered a deprivation of rights, privileges or immunities secured by the Constitution. In the instant action, Plaintiff is claiming a deprivation of his First Amendment right to freedom of speech and association by alleging he was retaliated against for running for political office and speaking out on matters of public concern. (*See* Doc. #53 at ¶ 8).

Although delineated as a single claim, Count I of Plaintiff's amended complaint (Doc. #53) includes, apparently, nine (9) distinct § 1983 freedom of speech and association causes of action. (Doc. #53). Plaintiff alleges: (1) Defendant retaliated against Plaintiff by telling Plaintiff that he would be forced to take a leave of absence if he persisted in seeking political office; (2) Defendant retaliated against Plaintiff by denying him a promotion opportunity; (3) Defendant retaliated against Plaintiff by denying him previously scheduled job training opportunities; (4) Defendant retaliated against Plaintiff by denying him direct contact with Chief Getchell; (5) Defendant retaliated against Plaintiff by intentionally leaving his name off of press releases; (6) Defendant retaliated against Plaintiff by "demoting" him to records clerk; (7) Defendant retaliated against Plaintiff by falsifying evidence and falsely accusing him of crimes, misconduct, and policy violations; (8) Defendant retaliated against Plaintiff by engaging in acts of character assassination; and (9) Defendant retaliated against Plaintiff by constructively discharging him. (Doc. #53).

A public employee does not enjoy an absolute right to free speech; however, a state may not demote, discharge, or otherwise engage in adverse employment action against a public employee in retaliation for protected free speech. *See Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001); *see also Stavropoulos v. Firestone*, 361 F.3d 610, 618-20 (11th Cir. 2004) (concluding that a court may apply Title VII standards to First Amendment retaliation claims).

Courts utilize a four-part test based on the United States Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563 (1968) to determine whether a state actor has retaliated against an employee because of the employee's protected speech. *Chesser*, 248 F.3d at 1122.

Courts consider: (1) whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern; (2) whether the employee's interests in exercising his right to free speech is outweighed by the state's interest in promoting the efficiency of public service; (3) whether the employee's speech was a substantial motivating factor in the state's decision to demote, discharge, or otherwise engage in adverse employment action against the employee; and (4) once the plaintiff employee has established the aforementioned three factors, at the fourth step, the burden shifts to the defendant to show that the state would have reached the same decision to demote, discharge, or otherwise engage in adverse employment action against the employee absent the protected speech. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565-66 (11th Cir. 1989); *see also Pickering*, 391 U.S. 563.

The first two *Pickering* factors are threshold matters of law for the trial judge to determine. *Brochu v. City of Riviera Beach*, 304 F.3d 1144 (11th Cir. 2002). "Only if those two stages are satisfied does the matter go to the fact-finder, *i.e.* the jury, for a determination [of the second two factors]." *Id*. at 1157.

**1. Speech on a Matter of Public Concern**

In determining whether the employee's speech relates to a matter of public concern, courts look at the content, form and context of the speech, and whether the employee is speaking as a citizen or as an employee. *Chesser* at 1123; *see also Bryson* at 1565.

In the instant matter, Plaintiff claims the speech he engaged in was both his decision to run for public office and his campaign platform. (Sharp Dep. at 60-61; Sharp Aff. at ¶ 1). The specific content of the speech at issue appears to generally include Plaintiff's intention to run for Sheriff of Putnam County (Sharp Dep. at 60) and his political platform to consolidate the PPD and the Putnam County Sheriff's Office. (*See* Harper Aff. at ¶ 5 and Thomas Aff. at 3). Plaintiff further contends that the context of his protected political speech was within a political campaign. (*See* Doc. #49 at 3-5).

Plaintiff alleges the City of Palatka deprived him of free speech and association through its employees, Chief Getchell and Assistant Chief Griffith. (Sharp Dep. at 77). Although neither Chief Getchell nor Assistant Chief Griffith were present at any time Plaintiff's speech allegedly occurred, there is evidence that suggests Getchell and/or Griffith were made aware of Plaintiff's decision to run for Sheriff and his political platform by third parties. For instance, a Palatka Daily News reporter spoke to Chief Getchell seeking comment on Plaintiff's public announcement of his candidacy for Sheriff (Getchell Aff. at ¶ 22) and Lt. Harper states in his affidavit that he told Chief Getchell Plaintiff intended to

consolidate the PPD and the Putnam County Sheriff's office, if elected. (Harper Aff. at ¶ 5).

The Supreme Court has held that "the private nature of [a] statement does not. . . vitiate the status of the statement as addressing a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387, n.11 (1987) (finding an employee's private conversation with a co-worker on a matter of public concern was protected speech even though the conversation was intended to be private but was overheard by a third party who relayed the conversation to the employer). Thus, the Court finds Plaintiff's private statements made to other PPD employees concerning his political platform would relate to a matter of public concern even though Chief Getchell or Assistant Chief Griffith may have learned about Plaintiff's political platform through third parties.

Several United States Supreme Court decisions support the proposition that a "plaintiff's interest in seeking office, *by itself*, is not entitled to Constitutional protection." *Burleson v. Colbert County N.W. Ala. Healthcare Auth.*, 221 F. Supp. 2d 1265, 1273 (N.D. Ala. 2002) (*citing Buckley v. Valeo*, 424 U.S. 1 (1972) (*emphasis added*); *Bullock v. Carter*, 405 U.S. 134 (1972); and *Williams v. Rhodes*, 393 U.S. 23 (1968)). In *Burleson*, the plaintiff in that case "offered no evidence of anything more than his candidacy for office," and presented no evidence that the employer voiced his disapproval of plaintiff's candidacy. *Burleson*, 221 F. Supp. 2d at 1275.

The *Burleson* court found that the plaintiff in that case failed to establish that merely seeking political office qualifies for First Amendment protection. "The announcement of [plaintiff's] candidacy, standing alone (*i.e.* with no evidence of partisanship or opposition to [plaintiff's] candidacy or his platform), does not present a clearly established

constitutional right." *Id.* The *Burleson* court concluded that, since the plaintiff failed to establish his candidacy qualified as protected speech under the First Amendment, his § 1983 action failed as a matter of law. *Id.*

Here, Plaintiff argues that in addition to announcing his intention to run for political office he asserted a political platform of wanting to consolidate the PPD with the Putnam County Sheriff's Office, and that this speech constitutes the additional factor needed to maintain his § 1983 action.

Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that (assuming Plaintiff, in fact, expressed his intention to consolidate the PPD with the Putnam County Sheriff's Office to fellow officers and the general public) Plaintiff's speech involving his political platform constitutes protected political speech related to a matter of public concern for the purpose of withstanding the instant motion for summary judgment.

**2. Balancing Employee and State Interests**

The second prong of the *Pickering* test balances the employee's interests in exercising his right to free speech against the state's interest in promoting the efficiency of public service. *Bryson*, 888 F.2d at 1565. The court should consider (1) whether the speech at issue impedes the state's ability to efficiently perform its duties; (2) the time, place and manner of the speech; and (3) the context of the speech. *Id.* at 1567.

Here, the degree to which Plaintiff's speech impeded the PPD's ability to perform its duties efficiently is unclear; however, a lack of evidence that Plaintiff's speech impeded the PPD's performance suggests that there was either a lack of or minimal imposition on the PPD.

There is some evidence to suggest that at least some of Plaintiff's speech occurred while on duty with the PPD. This includes a January 9, 2004 memo by Chief Getchell to "All Police Department Personnel," which attached the city's policies regarding employee participation in political campaigns (*see* Getchell Aff., Exh. L) and Lt. Harper's statement that Plaintiff discussed his campaign and political platform while on duty until the January 9, 2004 memo was issued. (Harper Aff. at ¶ 5). Further evidence that Plaintiff's speech occurred while on duty is a February 16, 2004 memo from Chief Getchell to Plaintiff regarding telephone calls from the media concerning Plaintiff's campaign. (*See* Getchell Aff., Exh. M).

The Court, however, finds the aforementioned instances of Plaintiff's speech, although occurring on duty, did not impede the PPD's performance of its duties such that Plaintiff's interests in exercising his right to free speech is outweighed by the state's interest in promoting the efficiency of public service–especially considering the high value and great protection afforded political speech. *See generally R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992).

**3. Substantial Motivating Factor**

As mentioned above, the following *Pickering* factor would ultimately be determined by the fact-finder. For instance, to maintain a § 1983 action, Plaintiff must prove to the jury that his speech was a substantial motivating factor in the retaliatory actions, if any, taken against him. *Bryson*, 888 F.2d at 1566.

Although a close temporal proximity of adverse employment action or retaliation suggests a causal relationship, *Akins v. Fulton County*, 420 F.3d 1293, 1305 (11th Cir. 2005), "issues of motivation are generally improper for disposition on summary judgment

because without a searching inquiry into. . . motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of *post hoc* rationalizations." *Holley v. Seminole County Sch. Dist*., 755 F.2d 1492, 1505 (11th Cir. 1985) (*citing Peacock v. Duval*, 694 F.2d 644, 646 (9th Cir. 1982)).

Accordingly, there appears to be a genuine issue of material fact as to whether Chief Getchell and/or Assistant Chief Griffith engaged in retaliatory actions against Plaintiff, and as to whether City Manager Bush ratified those actions, through inaction, based on unconstitutional reasons pursuant to municipal custom, as will be discussed below.

**4. Whether Defendant Would Have Reached the Same Decision to Demote, Discharge, or Otherwise Engage in Adverse Employment Action Absent the Protected Speech**

In determining the issue of summary judgment, the Court need not address this final step of the *Pickering* analysis because Plaintiff, the nonmoving party, bears the burden of proof for only the first three elements. *Bryson*, 888 F.2d at 1565-66. Moreover, this would be an issue for the factfinder.

**C. 42 U.S.C. § 1983 Deprivation of Rights Under Color of Statute, Ordinance, Regulation, Custom or Usage**

In order to maintain a § 1983 freedom of speech and association action against a municipality, a plaintiff must show that a deprivation was effectuated under color of statute, ordinance, regulation, custom or usage. Otherwise, a plaintiff's claim will fail as a matter of law because a municipality cannot be held liable under § 1983 on the basis of *respondeat superior*.

> Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy [or custom] of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be

> held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978) (*emphasis original*).

"A custom is defined as a widespread practice...*so permanent and well settled as to constitute... the force of law*." *Bland v. Madison County, Fla.*, 895 F. Supp. 1515, 1520 n.6 (N.D. Fla. 1995) (*emphasis added*). Although this is a rigid standard, evidence that a defendant has twice before retaliated against individuals based on their First Amendment right to free speech has been held to be probative evidence that a custom or policy exists, giving rise to liability under § 1983. *See Dougherty v. Barry*, 604 F. Supp. 1424, 1440 (D.C.D.C. 1985).

Here, Plaintiff alleges that the City of Palatka, through its police chiefs acting in conjunction with City Manager Bush, have discriminated against employees in the past by retaliating against them for unconstitutional reasons. (Doc. #53 at 8). Plaintiff points to two civil cases previously filed in this Court which arguably support Plaintiff's contention that the City of Palatka has a widespread practice of discriminating and retaliating against its employees in violation of its employees' rights to freedom of speech and association under the First Amendment.

Specifically, Plaintiff draws the Court's attention to *Dzioba v. City of Palatka*, Civ. Action No. 3:00-cv-591-J-25A (M.D. Fla. June 2, 2000) and *Tatum v. City of Palatka*, Civ. Action No. 3:00-cv-592-J-21B (M.D. Fla. June 2, 2000); although both of these cases settled out of court, the plaintiffs in these cases alleged that the City of Palatka, through its then acting police chief and in conjunction with City Manager Bush, engaged in adverse employment action based on unconstitutional reasons.

Plaintiff further names four additional individuals that have alleged they suffered retaliation at the hands of one of the City of Palatka's police chiefs and City Manager Bush based on violations of their rights to freedom of speech and association. (Doc. #53 at 8).

Although the evidence produced by Plaintiff concerning these additional individuals is not conclusive concerning whether or not they suffered retaliatory acts in violation of their rights to freedom of speech and/or association, the Court finds that based on the totality of the evidence, Plaintiff has created a genuine issue of material fact as to whether the City of Palatka has a municipal custom of retaliating against its employees for unconstitutional reasons.

Additionally, although a municipality may be liable under § 1983 pursuant to a municipal custom or policy, a municipality may also be held liable for a single unconstitutional act if the act were committed by a municipal decision maker with final policymaking authority. In order to confer liability on a local governmental body for a single decision of a government actor, a plaintiff must show either: "(1) the official was delegated final policy making authority with respect to the action in question or (2) the final policymaker ratified a subordinate official's actions *for unconstitutional reasons*." *Bland*, 895 F. Supp. at 1520 (*emphasis added*).

To determine whether a particular official has final policy making authority a court must look to state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). In essence, if the action was pursuant to a policy adopted by officials who are responsible for making such policy under state law, then liability may attach. *Id.* In *Praprotnik*, the United States Supreme Court expressed that,

> A federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it. And certainly there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself.

*Id.* at 126. Additionally, the identification of final policy making officials is a question of state law for the trial judge to decide. *Id*. at 124.

In the instant case, the applicable state law setting forth policymaking authority for the City of Palatka is the Palatka Municipal Code, which comprises both the city's charter and the city's municipal ordinances, and further describes Palatka's "commissioner-manager" plan of governance. Palatka Mun. Code part 1, art.II, § 21 (2006); part 2, ch. 1, § 1 (2006). Under the Municipal Code for the City of Palatka, the City Manager is "the chief administrative officer of the city, responsible to the [city] commission for the administration of all city affairs." Palatka Mun. Code part 1, art. III, § 39(2) (2006).

The City Manager is charged with directing and supervising the administration of all city departments and is the administrative head of all those departments, including the PPD. Palatka Mun. Code, pt. 1, art. III, § 42-31 (2006). The Palatka Municipal Code also establishes that the city shall have a police force and sets forth the duties of the Chief of Police. Palatka Mun. Code, pt. 2, art. II, § 42-31 (2006). Although the Chief of Police is given "exclusive control of the assignment and transfer of all officers and employees constituting the police force, his authority is "subject to the approval of the city manager." Palatka Mun. Code, pt. 2, art. II, § 42-31 (2006).

Under the Palatka Municipal Code , the Chief of Police is entrusted to establish rules and regulations and to supervise the entire police force; however, each of these duties are

carried out "under the direction of the city manager." Palatka Mun. Code, pt. 2, art. II, §§ 42-31, 42-32 (2006).

> When a subordinate's discretionary decisions are *constrained or subjected to review by authorized policymakers*, they [the policymakers] have retained the authority to measure the [subordinate] official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision *and the basis for it*, [the policymakers'] ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127 (*emphasis supplied*).

Here, as mentioned *supra*, all of Chief Getchell's decisions (including daily supervision) are constrained and/or subject to review by City Manager Bush. Plaintiff, however, argues that final policymaking is "shared" between City Manager Bush and Chief Getchell. (Doc. #49 at 11). Plaintiff contends Chief Getchell and City Manager Bush have "co-authority" to unilaterally make final policy decisions. (Doc. #49 at 12). In support of this argument, Plaintiff cites Palatka Police Department General Orders, which provides that an employee may be "immediately relieved of his/her duties, with pay, pending an internal investigation, if in the judgment of the supervisor, Chief of Police, or City Manager, such action is necessary." (Doc. #49 at 12; *see also* Palatka Police Dept. Gen. Orders, section 26.2.2(B), Doc. #50, Exh. 12).

Plaintiff's reliance on the police department order is misplaced. The language in the police department order appears to grant equal authority to any supervisor at the PPD, not only the Chief of Police and/or City Manager. This is contrary to the city's charter and the city's ordinances; therefore, the Court is not inclined to find an internal police department order trumps the law as adopted by the City of Palatka pursuant to its city charter and ordinances. *See Praprotnik*, 485 U.S. at 125-26.

The City of Palatka's charter and personnel rules establish that "final policymaking authority" for the City of Palatka does not lie with the chief of police, but with the city manager and the city commission. Palatka Mun. Code part 1, art.II, § 21 (2006); part 2, ch. 1, § 1 (2006). (*See also* Bush Aff. at ¶¶ 2-5). Moreover, the City of Palatka Personnel Rules and Regulations set forth the procedures for review of grievances. (City of Palatka Personnel Rules, §§ 10.1-4, Doc. #85; *see also* Bush Aff., Exh. A). The regulations state that "City Manager Bush will meet with any employee on *any grievance*, *at any time* to effect a solution." (City of Palatka Personnel Rules, § 10.1(D), Doc. #85 (*emphasis added*); *see also* Bush Aff., Exh. A)

Plaintiff argues that the City of Palatka's grievance procedures were merely theoretical and ineffectual (Doc. #49 at10); however, Plaintiff has availed himself of these procedures three times before. (Bush Aff. at ¶ 5). Plaintiff was even successful in utilizing the grievance procedure under City Manager Bush once before. (Bush Aff. at ¶ 6).

The grievance procedure section of the City of Palatka Personnel Rules provides that a complainant shall file a complaint verbally or in writing and that the City Manager shall conduct an investigation of the same. (City of Palatka Personnel Rules, § 10.4, Doc. #85). The personnel rules further provide that, "A written determination as to the validity of the complaint, and a description of the Resolution, if any, shall be issued by Allen R. Bush, City Manager, and a copy forwarded to the complainants [sic.] no later than fifteen (15) days after its filing." (City of Palatka Personnel Rules, § 10.4(D), Doc. #85).

Plaintiff states that he submitted a grievance to Chief Getchell on March 4, 2004, which accused Chief Getchell of retaliating against Plaintiff and opening unfounded internal affairs investigations against him. (Sharp Aff. at ¶ 29). Chief Getchell forwarded this

grievance to City Manager Bush. (Getchell Aff. at ¶ 26). City Manager Bush maintains that after receiving Plaintiff's grievance, he advised Plaintiff he would have to await the results of the internal affairs investigation before taking any action. (Bush Aff. at ¶ 10).

On Friday, March 12, 2004, after being advised of his reassignment to the records department, Plaintiff allegedly went to City Manager Bush and complained about Chief Getchell's actions in "demoting" him in retaliation for his political speech. (Sharp Aff. at ¶ 30). City Manager Bush makes no mention of this alleged meeting in his affidavit. (*See* Bush Aff.).

Plaintiff resigned one day after being reassigned by Chief Getchell, on March 13, 2004. (Sharp Aff. at ¶ 31). City Manager Bush explains in his affidavit that, due to Plaintiff's resignation, it was determined that no further action was necessary regarding Plaintiff's March 4, 2004 grievance. (Bush Aff. at ¶ 10). City Manager Bush further states that "If Mr. Sharp [Plaintiff] felt that he had been forced to resign, he could have brought this matter to my attention and consistent with City Policy, I would have reviewed the matter and made a judgment. This never happened." (Bush Aff. at ¶ 12).

Indeed, under the grievance procedure, City Manager Bush had fifteen (15) days in which to respond, in writing, to Plaintiff's initial March 4, 2004 grievance; Plaintiff, however, resigned only nine days after filing that grievance and only one day after allegedly orally filing his second, March 12, 2004, grievance.[7]

Although Plaintiff has not produced conclusive evidence that City Manager Bush was even aware of Plaintiff's alleged political speech or that Bush was ever motivated in

[7] City Manager Bush makes no mention of any meeting or conversation with Plaintiff on March 12, 2004 or at any time following Plaintiff's reassignment.

his actions (or inaction) by Plaintiff's alleged political speech, Plaintiff has brought forth enough evidence to create a genuine issue of material fact as to whether the City of Palatka, through City Manager Bush, engages in a custom of retaliating against its employees by violating their rights to freedom of speech and/or association under the First Amendment.

**D. Plaintiff's § 1983 Claims**

In order to maintain a First Amendment retaliation claim under § 1983, Plaintiff must show that adverse employment action was taken against him in retaliation for engaging in protected speech. *Stavropoulos*, 361 F.3d 618. "A public employer retaliates when he takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech." *Id*. Furthermore, in determining whether an employment action is adverse, the Eleventh Circuit looks towards Title VII employment discrimination cases because "the standards are consonant." *Id*. at 620.

In 2004, the *Stavropoulos* court found that, in order for employment action to be considered adverse under Title VII, the complained of action "must involve an important condition of employment." *Id*. (listing discharges, demotions, refusals to hire or promote, and reprimands as actions that involve important conditions of employment). In 2006, however, the United States Supreme Court held that what may be considered adverse employment action under Title VII's anti-retaliation provision is "not limited to discriminatory actions that effect the terms and conditions of employment." *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2412-13 (2006).

The Supreme Court went so far as to say "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing

him harm o*utside* the workplace*."* *Id*. at 2412 (*emphasis original*). The Court reasoned that "a provision limited to employment-related actions [*i.e.* actions that relate only to important conditions of employment] would not deter the many forms that effective retaliation may take." *Id*.

In the instant case, Plaintiff alleges, apparently, nine (9) separate § 1983 claims of retaliation. Plaintiff alleges: (1) Defendant retaliated against Plaintiff by telling Plaintiff that he would be forced to take a leave of absence if he persisted in seeking political office; (2) Defendant retaliated against Plaintiff by denying him a promotion opportunity; (3) Defendant retaliated against Plaintiff by denying him previously scheduled job training opportunities; (4) Defendant retaliated against Plaintiff by denying him direct contact with Chief Getchell; (5) Defendant retaliated against Plaintiff by intentionally leaving his name off press releases; (6) Defendant retaliated against Plaintiff by "demoting" him to records clerk; (7) Defendant retaliated against Plaintiff by falsifying evidence and falsely accusing him of crimes, misconduct, and policy violations;[8] (8) Defendant retaliated against Plaintiff by engaging in acts of character assassination; and (9) Defendant retaliated against Plaintiff by constructively discharging him. (Doc. #53).

In *Burlington*, Supreme Court broadened the scope of adverse employment action in retaliation cases to include actions that are not necessarily related to an important condition of employment, so long as the actions are retaliatory. *See Burlington*, 126 S.Ct. 2405.

[8] The Court notes that there are different standards for determining whether there was probable cause for a claim of malicious prosecution than for determining whether an investigation was initiated because of unconstitutional reasons under § 1983. Under Count I of Plaintiff's amended complaint, whether Defendant had legitimate non-discriminatory reason for initiating investigations against Plaintiff is a question for the jury. *See Burlington*, 126 S.Ct. 2405.

Accordingly, under the *Burlington* standard, the Court finds Plaintiff has produced enough evidence to show a genuine issue of material fact exists as to whether the City of Palatka, through Chief Getchell and/or Assistant Chief Griffith, engaged in unconstitutional retaliatory actions that were ratified by City Manager Bush, *via* inaction, based on unconstitutional reasons pursuant to a municipal custom. The Court finds Plaintiff has raised a genuine issue of material fact related to his first eight claims, *supra*.

Although the Court finds Plaintiff has created a genuine issue of material fact as to his first eight claims, the Court does not find there is a genuine issue of material fact as to Plaintiff's ninth claim that he was constructively discharged.

**E. Plaintiff's Constructive Discharge Claim**

In any constructive discharge claim, the plaintiff must establish that "working conditions were so intolerable that a reasonable person would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (*internal citations omitted*); *see also Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432 (11th Cir. 1997). "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Mgmt.*, 93 F.3d 752, 754 (11th Cir. 1997).

The Eleventh Circuit has determined that one day is not a sufficient period of time because it does not provide the employer with a realistic opportunity to provide a solution. *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987).

On March 12, 2004, Plaintiff was reassigned to the records department, and he was ordered to relinquish his identification and police badge, his service weapon, and patrol vehicle. (Sharp Aff. at ¶ 30; Doc. #50, Exh. 13). Plaintiff states in his affidavit that

following his reassignment, he went to City Manager Bush and complained that the reassignment was retaliatory for his protected political speech. (Sharp Aff. at ¶ 30). City Manager Bush, however, never mentions this alleged conversation in his affidavit. (*See* Bush Aff.).

Plaintiff contends that *Garner* is distinguishable because the employer here, Chief Getchell, was already aware of the improper conduct because he had initiated the conduct. (Doc. #49 at 16). The assertion that because an employer takes action it is simultaneously aware of an employee's dissatisfaction with that action, such that no time for remedy shall be afforded, is simply illogical. Plaintiff was required to notify Chief Getchell, and if necessary City Manager Bush, of his intolerable work conditions and provide them a reasonable period of time to effectuate a remedy.

Viewing the facts in Plaintiff's favor, Plaintiff was justifiably dissatisfied with his reassignment and there does appear to be a question of fact as to whether Plaintiff complained to City Manager Bush following his reassignment. However, even if Plaintiff did complain to Bush on March 12, 2004 about being reassigned, Plaintiff tendered his resignation the next day–affording his employer no opportunity to remedy the situation.

Therefore, the Court finds that there is no issue of material fact as to Plaintiff's resignation one day after his reassignment, and without having provided his employer a reasonable time to effectuate a remedy, Plaintiff's constructive discharge claim fails as a matter of law.

## III. Conclusion

In conclusion, in viewing the evidence in a light most favorable to Plaintiff, the Court finds Plaintiff has produced enough evidence to withstand Defendant's instant summary

judgment motion. Plaintiff produced evidence that the City of Palatka may have engaged in a custom or practice of retaliating against its employees for speaking on matters of public concern in the past. Therefore, there appears to be a genuine issue of material fact as to whether the City of Palatka has a custom or policy that involves retaliating against employees it wishes to silence.

Plaintiff produced evidence that Chief Getchell knew Plaintiff was running for Sheriff. Due to the close temporal proximity of Plaintiff's announcement of his political ambitions and the alleged retaliatory acts, the Court finds a genuine issue of material fact exists as to whether Chief Getchell and/or Assistant Chief Griffith were motivated by Plaintiff's political ambitions and protected speech when they engaged in retaliatory acts, if any.

Plaintiff also produced evidence that City Manager Bush may have ratified by inaction Chief Getchell's alleged retaliatory acts based on unconstitutional reasons. Plaintiff produced probative evidence to support his theory that a custom or policy exists in the City of Palatka of ratifying police chief's retaliatory acts against its employees. For instance, Plaintiff produced evidence that City Manager Bush may have ratified a previous police chief's unconstitutional retaliatory acts by putting forth two prior complaints, filed in this Court, which alleged facts similar to Plaintiff's.[9]

Accordingly, it is hereby **ORDERED**:

1. Defendant's Motion to Strike Portions of Affidavits Filed in Opposition to Defendant's Motion for Summary Judgment and Motion to Strike Portions of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary

[9] The Court notes that it finds City Manager Allen Bush to be a city policymaker with final decision making authority, such that he can subject the City of Palatka to liability under 42 U.S.C. § 1983.

Judgment (Doc. #40) is **GRANTED to the extent that** statements which the Court deemed as inadmissable hearsay were not considered by the Court in deciding the instant motion.

2. Defendant's Motion for Summary Judgment (Doc. #24) is **GRANTED to the extent** that Plaintiff's 42 U.S.C. § 1983 claim for **constructive discharge is dismissed**. As a matter of law, there is no genuine issue of material fact as to whether Plaintiff was constructively discharged.

3. The remaining portions of Defendant's Motion for Summary Judgment (Doc. #24) are **DENIED**. Plaintiff has shown genuine issues of material fact exist as to the remaining claims alleged in Count I of Plaintiff's amended complaint (Doc. #53).

4. This Court's ruling on the instant motion is **limited to Count I of Plaintiff's amended complaint (Doc. #53)**. A separate motion for partial summary judgment concerning Count II of Plaintiff's amended complaint is still pending before the Court and has not yet been ruled upon.

**DONE AND ORDERED** at Jacksonville, Florida this 20th day of December, 2007.

Thomas E. Morris

**THOMAS E. MORRIS**
United States Magistrate Judge

Copies to all counsel of record
and *pro se* parties, if any